UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

DONNA DAVENPORT,                        :
on behalf of D.W.P.,
                                        :

                    Plaintiff,          :       14 Civ. 2734 (WHP)(HBP)
                                        :
     -against-                                  REPORT AND
                                        :       RECOMMENDATION
CAROLYN W. COLVIN, acting
Commissioner of Social Security,        :

                    Defendant.          :

----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE WILLIAM H. PAULEY, III, United States

District Judge,


I.   Introduction


          Plaintiff, Donna Davenport, brings this action on

behalf of her son D.W.P., a minor, pursuant to Section 205(g) of

the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking

judicial review of a final decision of the Commissioner of Social

Security ("Commissioner") denying D.W.P.'s application for

supplemental security income benefits ("SSI").  The Commissioner

has moved for judgment on the pleadings under Rule 12(c) of the

Federal Rules of Civil Procedure (Notice of Motion, dated October

14, 2014 (Docket Item 13)).  Plaintiff has filed an Affirmation

in Opposition to the Commissioner's motion (Affirmation in Opposition to Motion, dated October 22, 2014 (Docket Item 15) ("Pl.'s Aff.")).[1]

For the reasons set forth below, I respectfully recommend that the Commissioner's motion for judgment on the pleadings be denied and that the case be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

II.  Facts

    A.  Procedural
        Background

Plaintiff filed an application on behalf of D.W.P. for SSI on May 25, 2012, alleging that D.W.P. had been disabled since March 15, 2012 (Tr.[2] 57).  The Social Security Administration denied D.W.P.'s application, finding that D.W.P. was not disabled (Tr. 36).  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), but she subsequently waived the hearing on behalf of D.W.P. (Tr. 43-46, 54-55).  In a decision dated January 3, 2013, ALJ Brian W. Lemoine determined that

_____

[1]Because plaintiff's Affirmation is not serially paginated, I use the page numbers assigned by the Court's ECF system.

[2]"Tr." refers to the administrative record that the Commissioner filed with her answer, pursuant to 42 U.S.C. § 405(g) (see Notice of Filing of Administrative Record, dated April 24, 2014 (Docket Item 12)).

D.W.P. was not disabled within the meaning of the Act (Tr. 19-
32).  The ALJ's decision became the final decision of the Commis-
sioner on February 26, 2014 when the Appeals Council denied
plaintiff's request for review (Tr. 1-4).  Plaintiff commenced
this action seeking review of the Commissioner's decision on
April 14, 2014 (Complaint (Docket Item 1)).

    B.  D.W.P.'s
        Social Background

        Plaintiff alleges that D.W.P. suffers from oppositional
defiant disorder and a mood or bipolar disorder (Tr. 95).  D.W.P.
was born in April 2006 (Tr. 36, 57-62).  He was in kindergarten
at the time of his application (Tr. 99).

    1.  Function Report

        Plaintiff completed a function report on June 8, 2012,
describing her son's abilities (Tr. 81).  In that report she
stated that D.W.P.'s communication was limited, specifying that
he was unable to deliver telephone messages, repeat stories he
had heard, or tell jokes or riddles accurately (Tr. 84).  Plain-
tiff also reported that D.W.P.'s ability to learn was limited,
noting that he was unable to read simple words, unable to read
and understand simple sentences, unable to read or understand

stories in books or magazines, unable to write in script, unable
to spell most three to four letter words, unable to write a
simple story with six to seven sentences or add and subtract
numbers over ten (Tr. 85).  Plaintiff further noted that D.W.P.
did not know the days of the week or months of the year, did not
understand money, could not make correct change and could not
tell time (Tr. 85).

      Plaintiff reported that D.W.P. had no physical limita-
tions (Tr. 86).  She reported that his impairments did affect his
behavior with other people, specifying that he was unable to play
team sports (Tr. 87).  She stated that D.W.P. had friends his own
age, could make new friends and generally got along with adults
and teachers (Tr. 87).  She further wrote that "[h]e gets along
with people as long as he is on his med[ication]" (Tr. 87).

      Plaintiff reported that D.W.P.'s impairments affected
his ability to help himself and to cooperate with others (Tr.
88).  She noted that D.W.P. was able to use zippers, button his
clothes, take a bath or shower, brush his teeth, comb his hair,
pick up and put his toys away and get to school on time but that
he could not tie his shoes, wash his hair, choose clothes, eat by
himself, hang up his clothes, help around the house, do what he
is told most of the time, obey safety rules or accept criticism

or correction (Tr. 88).  She further wrote that D.W.P. was "[n]ot allowed to use a knife" (Tr. 88).

Plaintiff reported that D.W.P.'s ability to focus was limited, specifically noting that he did not keep busy on his own, did not finish things he started, did not work on arts and crafts projects and did not complete his homework or his chores (Tr. 89).

### 2.  Teacher Questionnaire

D.W.P.'s teacher at Anna S. Kuhl Elementary School, Andrea Schmitz, completed a Teacher Questionnaire on September 10, 2012 (Tr. 111).  Ms. Schmitz reported at that time she had been D.W.P.'s kindergarten teacher for six months (Tr. 104).  Ms. Schmitz reported that D.W.P. did not have an unusual degree of absenteeism (Tr. 104).  She also wrote that D.W.P. had no problems acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects or caring for himself (Tr. 105-09).  She wrote that D.W.P. did not have a medical condition that interfered with his functioning (Tr. 110).  She further wrote that she "never had any problems with [D.W.P.] [and that] [h]e was sweet, pa[i]d attention, [and] worked well with other[s]" (Tr. 110).

C.  D.W.P.'s
    Medical Background[3]

    1.  Treatment Records

        a.  Orange Pediatrics

        D.W.P. received treatment at Orange Pediatrics begin-
ning in 2006 (Tr. 118, 119-35).  These progress notes first
reflect behavioral issues in June 2011.  A progress note dated
June 3, 2011 reflects complaints of behavioral issues, and it
reports that D.W.P. stated "I'm gonna cut you" and "I'll kill
you" (Tr. 117).  The notes do not appear to state to whom D.W.P.
made these threats.  Much of this progress note is difficult to
read.  Another progress note dated October 13, 2011 reflects
D.W.P.'s complaint was that he was falling asleep in school a
couple of times per week (Tr. 117).

        b.  First Hospitalization

        On March 21, 2012, D.W.P. was admitted to Bon Secours
Community Hospital.  The hospital admissions staff wrote:

        [D.W.P. was] brought in by [his] mother due to [his]
        behavior[] [of] hitting [and] kicking [his] family.

_____

        [3]I recite only those facts relevant to my review.  The
administrative record more fully sets out D.W.P.'s medical
history (Docket Item 12).

> [D.W.P.] threaten[ed] to kill [his] sister in her
> sleep. [His mother] state[d] [that he] ha[d] picked up
> knives and [that she had] struggled to take [the]
> weapon[] away. [His mother] state[d] that she previ-
> ously took [him] to [a] psychiatrist [but that she]
> refused to give [D.W.P.] medications. [D.W.P.] ha[d]
> seen [a] psychologist who referred [him] to [a] [n]eur-
> ologist[.] [D.W.P.] has [an] app[ointmen]t with [the]
> [n]eurologist in [M]ay. [D.W.P.'s mother] state[d]
> [that] other children [we]re [afraid] of [D.W.P.] . . .
> . [D.W.P.'s mother] state[d] that [he] blacks out from
> anger and will, at times, calmly tell family members of
> his plan to stab them while they are sleeping.
> [D.W.P.] calmly described to this writer of how he
> planned to stab sister in h[er] sleep

(Tr. 159).

At the hospital, D.W.P. was examined by Dr. Edward
Orlando, M.D., who found that D.W.P. required "involuntary care
and treatment in a hospital providing inpatient services for
persons with mental illnesses" and that "as a result of his . . .
mental illness, [D.W.P.] pose[d] a substantial threat of harm to
self or others" (Tr. 147). Dr. Orlando also noted that D.W.P.
was "expressing [a] desire to kill [his] sister in [her] sleep
and [that his] family [members] state[d] that he punches and
kicks [them]" (Tr. 147). Plaintiff reported at that time that
D.W.P. was "threatening to harm [his] family members in their
sleep and ha[d] hit other family members and school staff and
pulled out knives that had to be wrestled away from him" (Tr.
149).

7

A nurse at Bon Secours Community Hospital monitored D.W.P.'s condition, noting that he remained calm and cooperative and that his mother and sister waited with him (Tr. 152).

As per Dr. Orlando's order, later that day D.W.P. was transferred by ambulance to Stony Lodge Hospital because he posed a threat of "harm to others" and required treatment from a pediatric psychiatrist (Tr. 145-46, 150).

At Stony Lodge, a biopsychosocial assessment and psychiatric evaluation of D.W.P. were conducted (Tr. 199). The report notes that D.W.P. was admitted because he was making homicidal threats and had threatened his family members with a knife (Tr. 200). The report states that D.W.P. was calm and cooperative and that he answered all questions without hesitation and without encouragement (Tr. 200). Parts of the report are difficult to read, but it appears that the report states that D.W.P. admitted to hitting, punching and kicking when he was mad or did not get his way and that D.W.P. also stated that he did not feel remorse after his aggressive behavior (Tr. 200). The report notes that D.W.P.'s admission to the hospital was occasioned by his sister asking him to take a bath, to which he responded by hitting, kicking, throwing anything he could reach and threatening to kill her (Tr. 200-01). This report also notes that D.W.P. had previously been expelled from school for giving

the principal a black eye (Tr. 209).  The report further notes
that D.W.P. perceived his relationship with his family to be
"good" (Tr. 209).  It also notes that D.W.P. was not then on
medication (Tr. 215).  At that time, D.W.P. had a Global Assess-
ment of Functioning ("GAF")[4] score of 33[5] (Tr. 220).

D.W.P. was discharged from Stony Lodge Hospital on
March 28, 2012 (Tr. 182).

c.  Second Hospitalization

On March 29, 2012, the day after D.W.P. was discharged,
he had another outburst and was readmitted to Stony Lodge Hospi-
tal (Tr. 179).  A Clinical Assessment and Psychiatric Evaluation
prepared on that date reported that D.W.P. had slapped his sister
across the face (Tr. 180).  He was then told to go to his room,
but he refused and grabbed a knife and held it up in a threaten-
ing manner (Tr. 180).  D.W.P.'s mother reported that while he was
holding the knife he was making growling sounds (Tr. 180-81).
The Assessment noted that D.W.P. was not receiving psychiatric

_____

[4]GAF rates overall psychological functioning on a scale of 0
to 100 that takes into account psychological, social and occupa-
tional functioning.  Diagnostic and Statistical Manual of Mental
Disorders, ("DSM-IV") at 32 (4th ed. rev. 2000).

[5]A GAF score of 31-40 indicates "[s]ome impairment in real-
ity testing or communication . . . [or] major impairment in
several areas such as work or school, family relations, judgment,
thinking or mood."  DSM-IV at 34.

treatment at that time, but it also stated that D.W.P. was prescribed Tenex and Depakote (Tr. 183).  At that time, D.W.P. had a GAF score of 31 (Tr. 195-96).

D.W.P. was released from Stony Lodge for the second time on April 10, 2012 (Tr. 174).  At that time, D.W.P. had been diagnosed with intermittent explosive disorder and a mood disorder and was prescribed Tenex, Risperdal and Depakote (Tr. 174). In addition, he was prescribed individual therapy, group therapy, family therapy, education, medication, recreation therapy and art therapy (Tr. 175).

D.W.P.'s discharge records state that his attitude towards treatment was positive, but that because he was five years old, he had some age-related limitations in understanding his treatment (Tr. 177).  The records further state that D.W.P. was able to follow the hospital staff's directions and partici- pate appropriately in programming, although he had one aggressive incident at the time of his readmission date (Tr. 177).  The records do not described the nature of this incident.  The records reflect that D.W.P. participated in individual therapy in the form of play therapy (Tr. 177).  D.W.P. participated in group therapy and was able to complete tasks with some redirection from hospital staff (Tr. 177).

A mental status exam dated April 10, 2012 indicated
that D.W.P. had an euthymic mood, appropriate affect, no suicidal
or homicidal ideation and no evidence of thought disorder,
delusions or hallucinations (Tr. 178).  At that time he had a GAF
score of 50 (Tr. 175).[6]

### d.   Subsequent Treatment

The record is not clear as to the nature of D.W.P.'s
subsequent treatment.  The aftercare plan from Stony Lodge
directed D.W.P. to see Phil Bennett in the intake department at
Orange County Mental Health on April 16, 2012 (Tr. 174).

Orange County Mental Health records reflect that D.W.P.
was seen by an assessing clinician Leah Roth on April 16, 2012
(Tr. 225).  Ms. Roth noted that D.W.P. had been prescribed Tenex,
Risperdal and Depakote (Tr. 225).  Ms. Roth also noted that
D.W.P. had received speech therapy (Tr. 227).  She wrote that
D.W.P. got along with other children "[s]ometimes okay [sic],"
and that D.W.P. saw a physician regularly (Tr. 228).

---

[6]A GAF score of 41-50 indicates "[s]erious symptoms . . .
[or] any serious impairment in social, occupational, or school
functioning."  DSM-IV at 34.

D.W.P. underwent a Psychiatric Evaluation at Orange County on May 4, 2012 (Tr. 231).  Viviana Galli, M.D., described D.W.P.'s history as follows:

> In the past years [D.W.P.] has been progressively aggressive, and irritable.  He often has terrible temper outburst[s] that follow[] [] "no["] words, or a request to do something he does not want to do.  He constantly argues with adults, actively defies, oppose[s] [sic] to do what he is being asked to do.  On purpose annoys others, all the time blames others, often angry, grouchy or irritable; he is also resentful [and] holds . . . grudges . . . .  He is doing better on med[ication] but in the middle of the day he acts up when med[ication] wear[s] off.  He is very hyper without the Tenex which is also wearing out in the middle of the day.  He is inattentive and impulsive.

(Tr. 231).  The exam reflected that D.W.P. had a labile mood but no suicidal or homicidal ideation, poor insight and judgment, severe social impairments and moderately impaired concentration (Tr. 231-32, 234).

Further records state that, starting on May 5, 2012, D.W.P. was receiving psychological treatment and that he had monthly appointments with a counselor and a psychologist (Tr. 222).  This record states that the "clinic notes" were not released because the patient did not consent to their release (Tr. 222-23 (release excludes psychotherapy notes as defined in 45 C.F.R. § 164.501)).[7]

---

[7]"Psychotherapy notes means notes recorded (in any medium)
(continued...)

2.  Consulting Physicians

Dr. Leslie Helprin, Ph.D., performed a Child Psychiatric Evaluation of D.W.P. on August 31, 2012 (Tr. 266).  At that time, D.W.P.'s mother reported that he had difficulty falling asleep but that his appetite was normal (Tr. 266).  She reported that D.W.P. threatened to kill other family members in their sleep and threatened to "cut them up" (Tr. 266).  D.W.P.'s mother and sister both reported at that time that D.W.P. threatened them with a knife about twice every month (Tr. 266).  They further reported that D.W.P. kicked and threw things when the staff at his school tried to put him in time out (Tr. 266-67).  D.W.P.'s mother also reported that he had difficulty concentrating on tasks but had no difficulty concentrating on play and that he had no symptoms of depression or thought disorders (Tr. 267).

---

[7](...continued)
by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record.  Psychotherapy notes excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items:  Diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date."  45 C.F.R. § 164.501.

Dr. Helprin conducted a mental status exam at that time.  Dr. Helprin found D.W.P.'s affect restricted, his concentration intact, his memory skills age-appropriate, his intellectual skills below average, his insight age-appropriate and his judgment fair (Tr. 268).

Dr. Helprin noted that D.W.P. was able to dress, bathe and groom himself, could drink from a cup and could use a spoon and a fork (Tr. 268).  D.W.P. reported that he did not help with any chores because he was not asked to help, but D.W.P.'s mother and sister reported that he would help put things away in his room only after much arguing (Tr. 268).  They also reported that D.W.P. had helped clean up his room only one time in the prior two weeks (Tr. 269).  Dr. Helprin noted that D.W.P. played with one friend in his neighborhood, but that his mother reported that he had no friends in school because the other children were afraid of him (Tr. 268).  D.W.P. reported to Dr. Helprin that he enjoyed riding his bike and playing video games and that he had a good relationship with his family aside from his outbursts of anger (Tr. 268).

Dr. Helprin concluded that

[w]ith regard to [D.W.P.'s] daily functioning, he is able to attend to, follow, and understand age-appropriate directions and complete age-appropriate tasks.  He has difficulty maintaining appropriate social behavior. He generally interacts adequately with peers, though by

14

the history, they tend to shun him due to fear.  He has
difficulty interacting adequately with adult authori-
ties.  The results of the examination appear to be
consistent with psychiatric problems and this may
significantly interfere with the claimant's ability to
function appropriately on a daily basis

(Tr. 269).  Dr. Helprin recommended that D.W.P. "continue with

psychiatric and psychological treatment as currently provided and

that he be evaluated by the Board of Education for alternative

educational placement and services to better meet his learning

and management needs" (Tr. 269).

T. Bruni, a consulting psychologist, completed a

Childhood Disability Evaluation on September 24, 2012 (Tr. 300).

Bruni does not appear to have examined D.W.P.  He found that

D.W.P. suffered from severe impairments but that those severe

impairments did not medically or functionally equal the listings

set for in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 299).

Bruni found that D.W.P. had no limitation in acquiring and using

information (Tr. 301).  Bruni opined that D.W.P. had less than

marked limitation in attending and completing tasks, noting that

treatment notes reflect medication for attention deficit hyperac-

tivity disorder ("ADHD") but that Ms. Schmitz found D.W.P. to

have no problems in that area (Tr. 301).  Bruni found D.W.P. had

less than marked limitations in interacting and relating with

others (Tr. 301).  Bruni noted that D.W.P. had a history of

significant difficulties in this area, but that at that time, his
teacher found that he had no issues, and that plaintiff reported
that D.W.P. had one friend in the neighborhood but no friends at
school (Tr. 301). Bruni found that D.W.P. had no limitations
moving about and manipulating objects, caring for himself or in
health and physical well-being (Tr. 302).

    D.  Additional Evidence

        1.  Appeals Council

            a.  New York Presbyterian

      Plaintiff submitted additional evidence to the Appeals
Council, including medical records from New York-Presbyterian
Hospital dated October 8, 2013 (Tr. 6). The records from New
York-Presbyterian dated October 8, 2013 consist of a document
from Dr. Despina Hatziergati, M.D., which lists the medication
prescribed for D.W.P. -- Depakote, methylphenidate and quetiapine
(Tr. 6-7).

            b.  Occupational Therapy

      Plaintiff submitted records from Eldred Central School
District documenting an occupational therapy evaluation of D.W.P.
On October 4, 2013, occupational therapist Cheryl Labella wrote

16

that "[D.W.P.]'s attention to task [wa]s functional with verbal
prompts in a one-on-one situation.  Right hand dominance [wa]s
seen.  Writing grasp [wa]s a mature tripod grasp with hyper-
extension at the first finger DIP joint.  Excess pressure [wa]s
placed on [the] pencil to provide increased hand stability.  Hand
instability [wa]s seen as bilateral hand tremors" (Tr. 10).  Ms.
Labella further reported that D.W.P.'s "[o]verall Fine Motor
Composite f[e]ll[] in the 42[nd] Percentile for Age in overall
fine motor skills" (Tr. 10).  Ms. Labella found that D.W.P.'s
"[v]isual motor skills [we]re in the 6[th] percentile for age,
falling in the below average range. . . .  Difficulty [wa]s seen
in size, angles, and direction of designs.  Inaccuracy seen with
overlapping lines and start/end points do not meet.  Motor
planning more complex geometric designs [wa]s difficult" (Tr.
11).  Ms. Labella also found that D.W.P.'s "[v]isual perception
[wa]s below average for age, falling in the 1[st] percentile for
age[.] . . .  Difficulties [we]re seen in the areas of figure
ground, visual memory, visual closure, and spatial relations"
(Tr. 11).  D.W.P.'s "ability to perceive the left/right direction
of letters and numbers [wa]s in the 1[st] percentile for age,
falling below normal limits. . . .  Difficulty [wa]s seen with
upper case letters, lower case letters, and numbers.  Most errors
[we]re found with lower case letters" (Tr. 11).

17

On October 17, 2013, Eldred Central School District recommended that D.W.P. receive "Occupational Therapy 2x/weekly, [for] 30 minutes [in a] small group" in order "to improve visual motor skill, visual perception, left/right integration and handwriting" (Tr. 8).

### 2. District Court

Plaintiff submitted additional evidence with her opposition to the Commissioner's motion.

Plaintiff submitted school records reflecting D.W.P.'s suspension on January 5, 2012 and January 6, 2012 (Pl.'s Aff. at 3). The records do not indicate the name of the school but state that it was located in South Fallsburg, New York (Pl.'s Aff. at 3). The form reported that

> [h]e was in class, taking a test and told to keep a 'Zero' Voice. He began to curse at Ms. Carlson and not follow her directions. Mrs. Stinehour went into the Main Hallway to meet D[.W.P.] and Ms. Carlson. There, D[.W.P.] began kicking and screaming. He was escorted into the Principal's Office. While in the office, he tried to bite and kick at Ms. Carraccia, Mr. Viornery, Mr. Viglione and Mrs. Stinehour. He threw several items, on hitting Mrs. Stinehour in the eye. He was screaming and cursing at the adults in the room

(Pl.'s Aff. at 3).

Plaintiff also submitted records from another incident in which D.W.P. was admitted to a hospital on October 25, 2013

18

and subsequently discharged on November 5, 2013 (Pl.'s Aff. at 5).  Documents from that admission state that he had a GAF score of 25 when admitted,[8] but had a GAF score of 46 when discharged (Pl.'s Aff. at 5).  The discharge summary also indicated a deferred diagnosis under "Personality Disorders/Mental Retardation" (Pl.'s Aff. at 5).  The summary does not state whether the deferred diagnosis related to a personality disorder or to mental retardation.  On the date of admission, D.W.P. was found to have low frustration tolerance, impaired reality testing and poor impulse control (Pl.'s Aff. at 11).  It was also noted that D.W.P.'s intellectual functioning was average, but it also appeared that he was in a special education program (Pl.'s Aff. at 12-13).  During this hospital admission, it was recommended that D.W.P. receive treatment on a weekly basis going forward (Pl.'s Aff. at 13).  At that time D.W.P.'s mother reported that he talked in his sleep and would wake up running and screaming while sleeping (Pl.'s Aff. at 14).

        Further forms from his treatment during this hospitalization describe an incident in which D.W.P. became frustrated when he was unable to fold an origami figure, and when his mother

---

[8] A GAF score of 21 to 30 indicates "[b]ehavior is considerably influenced by delusion or hallucinations [or] serious impairment in communication or judgment . . . [or] inability to function in almost all areas." DSM-IV at 34.

offered to help or change activities, D.W.P. became agitated, began hitting his head on the table, and yelled at his mother that if she did not stop speaking, he would continue to hurt himself (Pl.'s Mem. at 19).  D.W.P. was nervous, irritable and angry, exhibited a distracted thought process, had thought content that included hallucinations, and had impaired attention and concentration (Pl.'s Aff. at 20).  These documents also include a psychological report from a physician at the hospital to which he was admitted on October 25, 2013 (Pl.'s Aff. at 18-37).

Plaintiff has also attached documentation from the Eldred School District reflecting that D.W.P. was suspended for several days for aggressive behavior towards his classmates in 2014 (Pl.'s Aff. at 38-39).

III.  Analysis

    A.  Applicable
        Legal Principles

        1.  Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. §

405(g); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.); accord Johnson v. Bowen, supra, 817 F.2d at 986, but "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration," Johnson v. Bowen, supra, 817 F.2d at 986.

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive

21

effect' so long as they are supported by substantial evidence."
Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam),
quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).
Thus, "[i]n determining whether the agency's findings were
supported by substantial evidence, 'the reviewing court is
required to examine the entire record, including contradictory
evidence and evidence from which conflicting inferences can be
drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417, quoting
Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per
curiam).  Where, as here, the claimant has submitted new evidence
to the Appeals Council following the ALJ's decision, such evi-
dence becomes part of the administrative record.  See Brown v.
Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Perez v.
Chater, 77 F.3d 41, 45 (2d Cir. 1996).

>       2.   Determination
>            of Disability

     Under the Social Security Act, a claimant under the age
of eighteen is disabled if he can establish that he "has a
medically determinable physical or mental impairment, which
results in marked and severe functional limitations, and which
can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

The regulations promulgated by the Commissioner set forth a three-step test to implement the foregoing definition. 20 C.F.R. § 416.924(a); see Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004); White ex rel. Johnson v. Barnhart, 409 F. Supp. 2d 205, 207 (W.D.N.Y. 2006); Vazquez ex rel. Jorge v. Barnhart, 04 Civ. 7409 (GEL), 2005 WL 2429488 at *4 (S.D.N.Y. Sept. 30, 2005) (Lynch, D.J.).  The first inquiry is whether the child claimant is engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  If the child claimant is engaged in such activity, he is not disabled.  If the child claimant is not so engaged, the inquiry proceeds to the question of whether the child claimant has a "medically determinable impairment[ ] that is severe."  20 C.F.R. § 416.924(c).  An impairment is "severe" if it is more than a "slight abnormality" or if it is "a combination of slight abnormalities that causes . . . more than minimal functional limitations."  20 C.F.R. § 416.924(c).  If the child claimant's impairment is not severe, she is not disabled.  If the child claimant has a severe impairment, the third inquiry is whether the impairment meets, medically equals or functionally equals an impairment listed in the Social Security Administration's Listing

23

of Impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.924(d).

An impairment is "medically equivalent" to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a). An impairment is "functionally equ[ivalent]" to a listed impairment if it results in "'marked' limitations" in two of six domains of functioning or an "'extreme' limitation" in one domain.  20 C.F.R. § 416.926a(a).  The six domains of functioning for minors are:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

B.  <u>The ALJ's Decision</u>

The ALJ found that D.W.P. was a preschooler on May 25, 2012, the date the application was filed and that at the time of the opinion, D.W.P. was a school-age child (Tr. 22).

The ALJ next found that D.W.P. had not engaged in substantial gainful activity since May 25, 2012, the date the application was filed (Tr. 22).

24

The ALJ concluded that D.W.P. had severe impairments, consisting of ADHD, intermittent explosive disorder and a mood disorder (Tr. 22).

The ALJ found that D.W.P. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 22).  The ALJ found that D.W.P. did not experience a marked limitation in any of the domains of functioning in Paragraph B of the listings for Sections 112.04, 112.08 and 112.11 (Tr. 22).

The ALJ next determined that D.W.P. did not have an impairment or combination of impairments that functionally equaled the severity of the listing (Tr. 22).

The ALJ found that D.W.P.'s mother was not entirely credible with respect to the severity of her son's symptoms and the extent of his limitations (Tr. 25).  Specifically, the ALJ noted that plaintiff told Dr. Helprin that D.W.P. could dress, bathe and groom himself at an age-appropriate level, that she reported that while he had no friends at school, he did have one friend in the neighborhood and could occasionally assist with cleaning his room (Tr. 25).  The ALJ also noted that while D.W.P. was hospitalized, he was stabilized with treatment and discharged with a benign mental status exam (Tr. 25).  The ALJ further found

25

that while D.W.P.'s mother alleged that he performed poorly and behaved poorly at school, D.W.P.'s teacher did not report any problems at all (Tr. 25).

When assessing the opinions in the record, the ALJ gave the greatest weight to the opinion of the consultative psychologist Dr. Helprin (Tr. 25).  The ALJ noted that while Dr. Helprin did not treat D.W.P., she did perform a comprehensive mental status exam and her opinion was consistent with the benign findings of that exam and consistent with Ms. Schmitz's report (Tr. 25).  The ALJ also accorded great weight to Dr. Bruni's opinion (Tr. 25).  The ALJ noted that even though Dr. Bruni did not examine or treat D.W.P., he did review the entire medical record prior to offering an opinion and his conclusions were consistent with those of Dr. Helprin and Ms. Schmitz (Tr. 25). Finally, the ALJ gave great weight to Ms. Schmitz's opinion as well because she taught D.W.P. daily for ten months[9] and her opinion was consistent with that of Dr. Helprin and with D.W.P.'s mother's statements that D.W.P. was generally well-controlled when he was taking his medication (Tr. 26).

---

[9]Ms. Schmitz reported that she had taught D.W.P. for six months at the time of her opinion.  It is not clear from the record whether she continued to teach D.W.P. for another four months.

The ALJ found that D.W.P. had no limitations in acquir-
ing and using information (Tr. 27).  The ALJ noted that Ms.
Schmitz found no limitation in this area and that D.W.P. had not
been evaluated for special education services (Tr. 27).

The ALJ concluded that D.W.P. had less than marked
limitation in attending and completing tasks (Tr. 28).  The ALJ
noted that D.W.P.'s mother told Dr. Helprin that he had diffi-
culty staying focused enough to complete tasks, but also stated
that he could maintain attention while playing (Tr. 28).  The ALJ
further noted that Dr. Helprin found D.W.P.'s concentration and
attention to be intact, despite mildly impaired memory (Tr. 28).
The ALJ also noted that Ms. Schmitz found that D.W.P. had no
difficulty concentrating and that D.W.P.'s mother noted that he
was less hyperactive and more attentive when taking medication
(Tr. 28).

The ALJ determined that D.W.P. had less than marked
limitation interacting and relating with others (Tr. 29).  The
ALJ noted that D.W.P. had never been evaluated for a speech or
language disorder (Tr. 29).  The ALJ noted that he did have a
documented history of aggressive behavior towards his family, and
that while his mother alleged that he was aggressive towards his
peers, she told Dr. Helprin that D.W.P. did have one friend in
the community and also stated that when medicated he got along

27

with others (Tr. 29).  The ALJ also noted that Ms. Schmitz found
that D.W.P. was sweet and worked well with others and that both
Dr. Helprin and the examining psychiatrist at the Orange County
Department of Mental Health found him to be generally cooperative
(Tr. 29).

The ALJ concluded that D.W.P. had no limitation in
moving about and manipulating objects (Tr. 30).  The ALJ found
that although D.W.P.'s mother alleged that D.W.P. had difficulty
tying shoes and buckling seat belts, she did not allege any
specific issue with fine or gross motor skills and none were
observed by D.W.P.'s teacher or pediatrician (Tr. 30).

The ALJ found that D.W.P. had no limitation in his
ability to care for himself (Tr. 31).  The ALJ noted that
D.W.P.'s mother reported to Dr. Helprin that he was able to
dress, bathe, feed and groom himself in an age-appropriate manner
and she did not mention any difficulty observing safety rules or
engaging in hobbies (Tr. 31).

The ALJ found that D.W.P. had no limitation in health
and physical well-being (Tr. 32).  The ALJ noted that D.W.P. had
no severe medically determinable physical impairment (Tr. 32).
The ALJ stated that while D.W.P. took medication for mental
impairments, there were no reported side effects from those
medications (Tr. 32).

The ALJ found that D.W.P. did not have an impairment or combination of impairments that resulted in either marked limitations in two domains of functioning or extreme limitation in one domain of functioning (Tr. 32).  Therefore, the ALJ concluded that D.W.P. was not disabled (Tr. 32).

C.  Analysis of the
    ALJ's Decision

Plaintiff argues that the Commissioner's motion should be denied (Pl.'s Aff. at 2).  She notes the severity of D.W.P.'s "behavior involving his mood disorder" and urges consideration of the additional information that she submitted with her opposition brief (Pl.'s Aff. at 2).  She also argues that D.W.P. suffers from borderline mental retardation, which she claims is documented by the evidence she attached with her opposition brief (Pl.'s Aff. at 2).

As an initial matter, in light of the fact that plaintiff is proceeding pro se and on behalf of a minor, I first address whether D.W.P. received a full and fair hearing.  Price ex rel. A.N. v. Astrue, 42 F. Supp. 3d 423, 432 (E.D.N.Y. 2014) ("Before examining the sufficiency of the evidence, the district court 'must first be satisfied that the claimant has had a full hearing under the [Commissioner's] regulations and in accordance

with the beneficent purposes of the [Social Security] Act.'"
(alterations in original)), quoting Cruz v. Sullivan, 912 F.2d 8,
11 (2d Cir. 1990).

### 1. Duty to Develop
   the Record

"It is the rule in [the Second] [C]ircuit that 'the
ALJ, unlike a judge in a trial, must [him]self affirmatively
develop the record' in light of 'the essentially non-adversarial
nature of a benefits proceeding.'"  Pratts v. Chater, 94 F.3d 34,
37 (2d Cir. 1996), quoting Echevarria v. Sec'y of Health & Human
Servs., 685 F.2d 751, 755 (2d Cir. 1982).  "Where, as here, the
claimant is not only unrepresented by counsel but also acting on
behalf of a minor, the ALJ's duty to develop the record is
'particularly acute.'"  Price ex rel. A.N. v. Astrue, supra, 42
F. Supp. 3d at 432, quoting Encarnacion ex rel. George v.
Barnhart, 00 Civ. 6597 (LTS)(THK), 2003 WL 1344903 at *2
(S.D.N.Y. Mar. 19, 2003) (Swain, D.J.).

The ALJ is required "affirmatively to seek out addi-
tional evidence only where there are 'obvious gaps' in the
administrative record."  Eusepi v. Colvin, 595 F. App'x 7, 9 (2d
Cir. 2014) (summary order), quoting Rosa v. Callahan, 168 F.3d
72, 79, 79 n.5 (2d Cir. 1999); see also 20 C.F.R. § 416.912(d)

30

("Before we make a determination that you are not disabled, we will develop your complete medical history . . . .").[10]

> "[T]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." Selian, 708 F.3d at 420 (quoting Burgess, 537 F.3d at 129); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician sua sponte if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to the duty to develop the record. . . ." Lacava v. Astrue, No. 11-CV-7727 (WHP)(SN),

---

[10]On March 26, 2012, the regulations were modified to delete language which imposed a duty to recontact a treating physician when "the report from [a claimant's] medical source contain[ed] a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.912(e)(1) (2010); see How We Collect & Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,651 (Feb. 23, 2012) (codified at 20 C.F.R. pt. 416). The amended regulations apply here. See Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (summary order) (applying the version of the regulations that were current at the time the ALJ adjudicated the plaintiff's claim).

"[T]he current amended regulations . . . give an ALJ more discretion to 'determine the best way to resolve the inconsistency or insufficiency' based on the facts of the case . . . ." Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 505 (S.D.N.Y. 2014) (Nathan, D.J.), quoting 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (2013). However, the regulations continue to "contemplate the ALJ recontacting treating physicians when 'the additional information needed is directly related to that source's medical opinion.'" Jimenez v. Astrue, 12 Civ. 3477 (GWG), 2013 WL 4400533 at *11 (S.D.N.Y. Aug. 14, 2013) (Gorenstein, M.J.), quoting How We Collect and Consider Evidence of Disability, supra, 77 Fed. Reg. at 10,652; accord Cancel v. Colvin, 14 Civ. 2034 (PKC), 2015 WL 865479 at *4 (S.D.N.Y. Mar. 2, 2015) (Castel, D.J.).

2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In
this Circuit, the [treating physician] rule is ro-
bust.") adopted, 2012 WL 6621722 (S.D.N.Y. Dec. 19,
2012).

Because "[t]he expert opinions of a treating
physician as to the existence of a disability are
binding on the fact finder, it is not sufficient for
the ALJ simply to secure raw data from the treating
physician." Jackson v. Colvin, No. 13-CV-5655
(AJN)(SN), 2014 WL 4695080, at *19 (S.D.N.Y. Sept. 3,
2014) (quoting Peed v. Sullivan, 778 F. Supp. 1241,
1246 (E.D.N.Y. 1991)).  Therefore, "the ALJ must 'make
every reasonable effort to obtain not merely the medi-
cal records of the treating physician but also a report
that sets forth the opinion of that treating physician
as to the existence, the nature, and the severity of
the claimed disability.'" Molina v. Barnhart, No. 04-
CV-3201 (GEL), 2005 WL 2035959, at *6 (S.D.N.Y. Aug.
17, 2005) (quoting Peed, 778 F. Supp. at 1246).

Downes v. Colvin, 14 Civ. 7147, 2015 WL 4481088 at *10-*11

(S.D.N.Y. July 22, 2015) (Cott, M.J.).

Here, there is no opinion regarding the nature and

severity of D.W.P.'s impairments in the record from a treating

source.  The treatment records relating to psychiatric treatment

are from D.W.P.'s two hospitalizations, his intake exam at Orange

County and a first exam by Dr. Galli at Orange County.  While it

appears that D.W.P. had received monthly psychiatric treatment

beginning in May 2012, there are no notes from that treatment in

the record.  While psychotherapy notes, as defined in 45 C.F.R. §

164.501, may have been excluded from plaintiff's release, the

regulation's definition of psychotherapy notes specifically

32

excludes "medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary . . . [d]iagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date."  45 C.F.R. § 164.501. There is no evidence that the ALJ sought any of these items from D.W.P.'s treating source.

Accordingly, I recommend that D.W.P.'s case be remanded for further development of the record.

2.  New Evidence

Plaintiff submitted new evidence in her opposition papers here that was not submitted to the ALJ or the Appeals Council.  The Commissioner does not make any arguments with respect to this new evidence.

The new evidence consists of (1) school records showing that D.W.P. was suspended for violent behavior in January 2012, (2) documentation from D.W.P.'s hospitalization from October 25, 2013 through November 5, 2013 for aggressive behavior, and (3) a letter from Eldred Mackenzie Elementary School showing that D.W.P. was suspended for violent behavior in June 2014.

Consideration of evidence submitted for the first time to the district court requires a showing that is it not duplica-

tive of other evidence in the record and is material to the time period during which D.W.P.'s benefits were denied.  See Cahill v. Colvin, 12 Civ. 9445 (PAE)(MHD), 2014 WL 7392895 at *31 (S.D.N.Y. Dec. 29, 2014) (Engelmayer, D.J.) (adopting Report & Recommendation) ("[N]ew evidence must be more than 'merely cumulative' and must be material -- that is, both relevant to the time period and probative."), citing Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988); accord Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991).  "'The concept of materiality requires . . . a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently.'"  Lisa v. Sec'y of Dep't of Health & Human Servs., supra, 940 F.2d at 43, quoting Tirado v. Bowen, supra, 842 F.2d 597.

        In addition, good cause must be shown for failure to produce the records earlier; however, plaintiff's pro se status and the ALJ's failure to develop the record (when the evidence predates the ALJ's decision) satisfies this requirement.  See Skrodzki v. Comm'r of Soc. Sec., 11-CV-5173 (MKB), 2013 WL 55800 at *5 (E.D.N.Y. Jan. 3, 2013); Espinar v. Shalala, 94 Civ. 6849 (HB), 1995 WL 679236 at *4 (S.D.N.Y. Nov. 15, 1995) (Baer, D.J.).

        Because I have determined that the record requires further development, I need not address whether the additional

evidence that plaintiff submitted provides independent grounds for remand. However, because I recommend remanding for further development of the record, I also recommend that the ALJ consider the school records reflecting D.W.P.'s suspension in January 2012 on remand, as they are new and material.

The remaining records, however, date from October 25, 2013, November 2013 and June 2014. The hospital records date from approximately ten or eleven months after the date of the ALJ's decision, and the Eldred School District records post-date the ALJ's decision by more than a year. As such, all are outside the relevant time period. While new evidence that post-dates the ALJ's decision is not automatically immaterial, Pollard v. Halter, supra, 377 F.3d at 193-94, unless plaintiff can establish that these records somehow bear on or illuminate D.W.P.'s condition during the relevant time period, the records here do not meet the materiality requirement. See Cairo v. Comm'r of Soc. Sec., 11-CV-3839 (DLI), 2013 WL 1232300 at *10 (E.D.N.Y. Mar. 26, 2013) ("[T]he proffered evidence, which suggests a worsening of [p]laintiff['s] condition after the ALJ's decision, does not provide a basis for remand and can only be considered in a new application for benefits."); accord Delvalle v. Colvin, 14 Civ. 1779 (PAE)(JCF), 2015 WL 1381536 at *3 (S.D.N.Y. Mar. 25, 2015) (Engelmayer, D.J.) (adopting Report & Recommendation); Gamble v.

35

Barnhart, 02 Civ. 1126 (GBD)(THK), 2004 WL 2725126 at *3
(S.D.N.Y. Nov. 29, 2004) (Daniels, D.J.) (adopting Report &
Recommendation).

Accordingly, on remand the ALJ should consider the 2012
school records, but not the other records that plaintiff submit-
ted with her opposition papers.

### 3.  Education Records

Because I recommend remanding this case based on the
ALJ's failure to develop the record adequately, which is integral
to the disability evaluation, I do not address whether any
further issues with the ALJ's opinion would require remand.  I do
note, however, that it may be helpful for the ALJ to develop the
record further with respect to issues concerning D.W.P.'s educa-
tion.

The only school record relating to the period after
D.W.P. began treatment is that of Ms. Schmitz, his kindergarten
teacher.[11]  It is not clear that Ms. Schmitz's opinion provides a

---

[11]In assessing the opinions in the record, the ALJ accorded
great weight to Dr. Helprin's opinion in part because he found it
to be consistent with the opinion of Ms. Schmitz (Tr. 25).  It is
unclear how Dr. Helprin's opinion, which stated that D.W.P. had
"difficulty maintaining appropriate social behavior" and "inter-
acting adequately with adult authorities" and that D.W.P.'s
condition might "significantly interfere with [his] ability to
(continued...)

full picture of D.W.P.'s school performance.  She found that
D.W.P. did not have abnormal absences, when there is documenta-
tion that he was hospitalized for approximately three weeks
during the time she appears to have been his kindergarten
teacher.  I also note that the ALJ wrote that Ms. Schmitz had
taught D.W.P. for ten months, when at the time of the opinion,
she had taught D.W.P. for only six months.

In addition, the is evidence that D.W.P. may have been
undergoing speech therapy during the relevant time period (Tr.
227), and Dr. Helprin, whose opinion was given the greatest
weight by the ALJ, found D.W.P.'s intellectual skills to be below
average and recommended that D.W.P. be evaluated for alternative
educational placement (Tr. 268-69).

On remand, I recommend that the ALJ further develop the
record with respect to D.W.P.'s educational records during the
relevant time period.

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respect-
fully recommend that the Commissioner's motion for judgment on

---

[11](...continued)
function appropriately on a daily basis" could be considered
consistent with Ms. Schmitz's opinion, which found no limitations
or difficulties at all.

the pleadings be denied and that the case be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable William H. Pauley, III, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Pauley.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:  New York, New York
        August 20, 2015

                              Respectfully submitted,


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge


Copies mailed to:

Ms. Donna Davenport
85 Ogden Road
Glen Spey, New York 12737

Joseph A. Pantoja, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York 10007